**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| MATTHEW PARKER,            ) | |
|                              ) | |
|         **Plaintiff,**     ) | |
|                              ) | |
|         **v.**              ) | No.  3:24 C 50051 |
|                              ) | |
| **BOARD OF EDUCATION FOR ROCKFORD** ) | Judge Rebecca R. Pallmeyer |
| **PUBLIC SCHOOLS DISTRICT #205;**   ) | |
| **EHREN JARRETT; and MATT ZEDIKER,** ) | |
|                              ) | |
|         **Defendants.**    ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Matthew Parker was employed by the Board of Education for Rockford Public Schools District #205 ("District 205" or "District") for ten years as the Director of Athletics, Activities, and Program Development.  Around November 2021, Parker's behavior at work began to change: he insisted on being able to work a concurrent job with another company, sent several incoherent emails to his boss and District 205 partners, and engaged in "insubordinate" conduct. After Parker stopped showing up to work on November 30, 2021, District 205 pursued his termination, and afforded him a pretermination hearing on December 6.  As it turns out, Parker was suffering through a mental health crisis at the time, and he was hospitalized from December 7–10 to treat his hypomania.  While he was in the hospital, he submitted paperwork seeking medical leave as authorized by the Family Medical Leave Act ("FMLA"), but the District did not process his request and instead conducted a final vote on his termination on December 14.

In this lawsuit, Parker alleges that Defendants' conduct violated the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the FMLA, and his rights to pre-termination due process.  Defendants seek summary judgment [53], arguing that they did not violate Parker's right to medical leave under the FMLA, did not discriminate against him on the basis of his disability, and afforded him due process.  For the reasons explained here, the motion is granted in part and denied in part.

## BACKGROUND

I. **Factual Background[1]**

District 205 hired Matthew Parker as the Director of Athletics, Activities, and Program Development in August of 2011. (DSOF [44] ¶ 4.) Ten years into his employment, during the second half of 2021, Dr. Ehren Jarrett, District 205's Superintendent, noted troubling changes in Parker's behavior, described in detail below. (*Id.* ¶ 6; Defs.' Resp [71] ¶ 4; Jarret Dep. [46] at 25:23–26:15.)

A. **Interactions Between Parker and Jarrett**

Jarrett scheduled a one-on-one meeting with Parker sometime before November 15, 2021 to discuss Parker's performance, but, according to Jarrett, rather than discuss Jarrett's concerns about Parker, during this meeting, Parker focused on what he believed were ways that Jarrett's own performance as superintendent could improve. Jarrett characterized Parker's behavior at the meeting as "disrespectful and insubordinate." (DSOF [44] ¶ 7; Jarrett Dep. [46] 29:4–30:6.)

On November 12, 2021, Parker informed Dr. Jarrett in a telephone call that he was out of the office and would not be able to attend a meeting (the subject of which is unclear from the record) scheduled for 4:00 p.m., presumably on the same day. (DSOF [44] ¶ 8; Defs.' Exh. 3, November 15, 2021 Email Exchange [40-1] at 1.) During the same phone call, Parker mentioned to Jarrett that he had received a job offer from Brandtek, a private employer in Wisconsin, that would involve a substantial increase in pay. (DSOF [44] ¶¶ 9, 15.) In response, Jarrett informed Parker via email that he needed to attend a meeting scheduled for November 16 to discuss future plans: either a succession plan in the case that Parker decided to take the Brandtek job, or, if

---

[1] The facts set forth here are presented in the parties' statements of fact pursuant to this court's Local Rule 56.1. Defendants' Local Rule 56.1 Statement of Material Facts is cited here as "DSOF [44] ¶ ___." Parker's Response to Defendants' Local Rule 56.1 Statement is cited here as "Pl.'s Resp. [67] ¶ ___." Parker has also submitted an Additional Statement of Facts (attached to his Response to Defendants' Statement of Facts) cited here as "PSOF [67] ¶ ___." Defendants' Response to Plaintiff's Additional Statement of Facts is cited here as "Defs.' Resp. [71] ¶ ___."

Parker decided to stay, plans for the District 205 Athletic Department moving forward. (*Id.* ¶ 10.) Parker proposed that he accept the job at Brandtek, a sports apparel supplier, and relocate his family to Madison, Wisconsin, while simultaneously maintaining his full-time employment at District 205. He sought Jarrett's approval for this arrangement, which would result in a substantial salary increase (whether as a result of the pay from Brandtek alone or as a result of enjoying two full-time incomes is not clear). (*Id.* ¶ 11; Parker Dep. [47] at 11:17–23.[2]) When asked at his deposition how realistic these plans were, Parker admitted that the plan was "completely unrealistic" and attributed the proposal to mental illness. (Parker Dep. [47] at 31:4–11 ("At this point, the manic episode was severe and so there were a lot of things that I believe that were completely unrealistic because I was very sick.").)

The next day, on November 17, Parker followed up with Jarrett via email, renewing his request for Jarrett's approval of his continuing work for the District even after accepting fulltime employment with Brandtek. Jarrett considered this "insubordinate" because "he had already informed Plaintiff that District policy did not allow full time employment elsewhere." (DSOF [44] ¶ 12.) Defendants have not explained when or where Jarrett informed Parker of this policy, and although Parker now recognizes his proposal was unrealistic, he disputes that District policy actually prohibited full-time secondary employment. (*Id.*; Pl.'s Resp. [67] ¶ 12.) Parker then proceeded to forward his email request for outside employment to all District 205 Athletic Directors and Jarrett's assistant; when asked about this email at his deposition, Parker could not recall why he forwarded it. (DSOF [44] ¶ 13; Parker Dep. [47] at 33:12–15.) Parker never submitted his request for outside employment to District 205's HR department, though, again, he disputes that he was required to do so. (DSOF [44] ¶ 21; Pl.'s Resp. [67] ¶ 21.)

On November 24, Jarrett sent an email to Parker relating to his responsibilities as Athletic Director, outlining "certain directives for Plaintiff to increase summer student engagement, and to

---

[2] *See also* Brandtek Home Page, https://brandtek.com/ (last visited Mar. 27, 2026).

build a summer basketball pilot program." (DSOF [44] ¶ 14.) Parker responded by stating that he would follow Jarrett's instructions, but only on the condition that Jarrett approve Parker's request for outside employment. (*Id.* ¶ 15 (undisputed).) Jarrett then "reported Plaintiff's insubordination, including Plaintiff's unwillingness to comply with Dr. Jarrett's directives without Plaintiff asking for certain preconditions to work, to Mr. Zediker [District 205's Chief Human Resource Officer] and District 205's General Counsel, Lori Hoadley." (DSOF [44] ¶¶ 16, 3.) At that point, Jarrett "believed the conduct sufficiently serious to warrant a recommendation of termination of Plaintiff's employment with District 205." (*Id.* ¶ 17.) Parker disputes that his behavior was insubordinate or reflected an unwillingness to comply, and "denies that his conduct was [an] irremediable cause for termination of a tenured employee under Illinois law." (Pl.'s Resp. [67] ¶¶ 16–17.)

### B. Parker is Diagnosed with Bipolar Disorder

On November 20, 2021, Parker began receiving treatment from Psychiatric-Mental Health Nurse Practitioner ("PMHNP") Courtney Forman via telemedicine. (DSOF [44] ¶ 57.) On the basis of this initial telemedicine visit, Forman reached the conclusion that Parker has bipolar disorder; when she treated him again on December 2, 2021, she determined that his behavior at that time was consistent with a hypomanic episode. (*Id.* ¶ 61; Defs.' Exh. 17, Medical Records [50] at 3; Forman Dep. [49] at 47:16–24.) In her deposition, Forman testified that the symptoms of hypomania can include "grandiosity, increased irritability, increased goal-directed activity, like sexual activity[, p]icking up new habits you don't normally pick up[, i]ncreased talkativeness, impaired concentration[, I]ncreased substance use[, d]ecreased need for sleep." (Forman Dep. [49] at 63: 6–13.) In her medical note, Forman noted that Parker was experiencing several of these symptoms including "grandiosity, excitability, high passion, more argumentative . . . increase[d] agitation and mood changes." (*Id.* at 32:10–24.) Forman also noted that Parker "used THC a few times per week including to self-medicate his alleged mood changes with marijuana consumption," and "admitted to misusing alcohol including hiding alcohol use from his wife and

4

self-medicating his alleged mood changes with alcohol consumption." (DSOF [44] ¶¶ 58, 60; *see* Pl.'s Resp. ¶¶ 58, 60.)

As days passed, Parker's hypomanic behavior became more severe. On November 23, 2021, Parker sent emails to District 205 Athletic Program employees urging them to check out Brandtek's website. (DSOF [44] ¶¶ 18–19.) The District claims that Parker violated District 205 policy in doing so because "it would be against District 205 policy for Plaintiff to retain District 205 as a customer for Brandtek and derive sales for Brandtek through District 205." (*Id.* ¶ 20,) Again, Parker denies that his emails violated any District policy. Pl.'s Resp. [67] ¶ 20.)

Between November 26 and November 30, Parker made a series of purchases for the Athletic Department that Defendants viewed as "unauthorized and unacceptable": these included payment for "charter bus services" for "student athletes from a non-District 205 high school"; "34 hotel rooms for non-District 205 basketball tournament participants"; "23 dozen assorted cupcakes for non-District 205 basketball tournament participants"; and "eight tickets for the 2021 Illinois High School Association Boys' Basketball State Finals." (DSOF [44] ¶¶ 22–25.) Parker contends that these purchases were actually authorized by the District, as demonstrated by the fact that the District voluntarily paid these vendors. Further, Parker states that these purchases "were never questioned by the [District] and/or administration until the [District] issued its Bill of Particulars seeking his dismissal as a tenured employee." (Pl.'s Resp. [67] ¶ 22.)

On November 30, 2021, Parker sent a flurry of incomprehensible, late-night emails to coworkers and supervisors. First, Parker sent two emails to Jarrett that Defendants characterize as disrespectful and insubordinate. (DSOF [44] ¶ 26.) In his first email, sent at 12:04 a.m., Parker wrote:

> EJ,
>
> I haven't heard a peep. For someone who threw the kitchen sink and "all that" at me, then to hear crickets.?? ALL my work makes you look good? Is that it?
>
> Not sure if you're all in OR working hard enough for "your people". Jessica, Soraya, Eli, black kids.

> What gives?  Did you confirm with Lori?  Are Jessica, Brad, Abby, Emily, Gus, Gary, Roy, Jim and Jessica ready for greatness and ZERO red tape to work??  "We are a team, I'm excited for the Appleton Project".  Do you want to grind and meet Bob Ley, Or . . . ?
>
> Thanks,
>
> Mat Parker, the guy who JUST raked the field to make the game happen.  You in?  Athletic Academy, $ promised for Athletic support specialist?  Hiring black coaches and supporting them with a 5 STAR HR department.  Your BFF is a ½ star at best.
>
> Let US know.  Happy to walk along side you, but are you??

(Defs.' Exh. 4, Email Exchanges [44-2] at 5.)  In his second email, sent two minutes later at 12:06 a.m., Parker wrote:

> At this point, we hear you loud and clear.  Replace me with "the durse".  Another terrible decision.
>
> COME ON MAN.  Lets get to work EJ!!

(*Id.*)  About a half hour later, Parker also sent what Defendants characterize as "disrespectful and unprofessional emails" to two executive officers of the Rockford Area Convention & Visitors Bureau—an organization with which District 205 has a business relationship.  (DSOF [44] ¶ 27.) The first email, sent on November 30, 2021 at 12:41 a.m. is marked as having "high importance" and reads:

> Absolutely astounding.  Not only will you NOT retweet the biggest event in Rockford this week, but you do not even show up.
>
> John won't take a meeting with the two guys who get it and make YOU look good.  That's why you beg for the numbers of attendance.
>
> When are you getting in the game?  Tom get's [sic] it.  Ehren get's it.  Jason get's it.  Fred get's it.  Danielle get's it.  Jury get's it . . . . . . should I go on of who we've met with??
>
> Incredibly disappointing as always!!

(Defs.' Exh. 11 [44-8] at 2.)  The second email, sent 5 minutes later, reads:

> I expect ZERO response Nick was good at that.  "I'll circle back", then crickets for months!!
>
> Who is leading?  Why aren't we on the board?

If it's about wealth and status, Jessica and I make the Provenzano's and Jarrett's look like small change. But we don't talk about it, because we are here for the kids and the real fight. And we want REAL relationships.

What are you two here for? We are confused as always.

(Defs.' Exh. 11 [44-8] at 1–2.) One of the recipients of these messages subsequently forwarded the emails to Zediker and "express[ed] her frustrations" about the contents of the email and Parker's "unprofessional approach." (DSOF [44] ¶ 28.) Parker does not deny sending these emails, but contends that "his decision to send these emails and the content of the emails themselves were manifestations of the mental health crisis he was experiencing at that time." (Pl.'s Resp. [67] ¶ 26; 27.)

### C. Parker Stops Showing Up to Work

On November 30, Mr. Zediker sent a text to Parker during the work day asking whether Parker was in the office, and Parker responded that he was not. Parker had not requested time off for that day, so Mr. Zediker instructed him to report to the District 205 Legal Department for a mandatory meeting later that day "to discuss serious issues with his employment," and informed him that "if he did not report to the meeting that day he would be placed on administrative leave." (DSOF [44] ¶¶ 30–34.) Defendants assert that they were going to give Parker an "opportunity to resign" at this meeting, had he attended. (Id. ¶ 36.) But Parker failed to attend, and the District put him on administrative leave. (Id. ¶¶ 35–38.)

In a text message sent later that day, Morgan Gallagher, Parker's direct supervisor, informed Parker of another mandatory meeting with the District 205 Legal Department the following day, December 1, 2021, at 9:30 A.M. (Id. ¶ 39.) Parker responded by telling Gallagher that he would be absent for the remainder of the week, without stating any reason for his absence. (Id. ¶ 40.) Parker did not attend the December 1 meeting. (Id. ¶ 41.) In response, a District 205 Human Resources Department representative delivered a Bill of Particulars to Parker's home residence with a cover letter that read:

7

> You were repeatedly directed to come to the Legal Department to discuss matters involving your conduct as an employee of the Rockford Public schools, district No. 205, and determining what corrective action (including possible discharge) is warranted. You repeatedly failed and refused to comply with these directives. Accordingly, we will be presenting the attached documents at the December 14, 2021 Board meeting with a recommendation that you be discharged as an employee of the District.

(*Id.* ¶ 42.)  The letter also invited Parker to appear for a "*Loudermill*" hearing with the District 205 Legal Department on December 6, 2021, to discuss the Bill of Particulars and other possible corrective actions before the Bill of Particulars would be presented to the District 205 Board of Education ("BOE") "with the recommendation for termination."  (*Id.* ¶ 43.)  Parker did not respond to the December 1 Letter, and he did not attend the December 6 *Loudermill* hearing.

On December 7, 2021, Mr. Gallagher informed Parker via text that "he had to turn in the District 205 property in his possession based on the impending recommendation to the District 205 Board of Education to terminate Plaintiff's employment."  (*Id.* ¶ 45.)  Parker texted Gallagher back with the words, "terminate me soft serve"; as Defendants interpret this terse message, it confirms that  "Plaintiff was aware that the recommendation to the District 205 Board of Education to terminate Plaintiff's employment was moving forward**."**  (*Id.* ¶ 46.)  Parker disputes this, denying that "he knew for certain that the recommendation for his termination was moving forward."  (Pl.'s Resp. [67] ¶ 46.)

### D.     Parker is Hospitalized

On December 7, 2021, Parker was voluntarily treated at UW Health SwedishAmerican Hospital in the Emergency Department for a "Psychiatric Problem."  (DSOF [44] ¶ 63; Defs.' Exh. 18, Medical Records [51] at 1.)  He was discharged from the clinic the same day.  (*Id.*)  The next day, Parker's wife checked him into the Psychiatric Unit at the same hospital, where he was involuntarily confined for a three-day stay.  (DSOF [44] ¶ 64–65; Parker Dep. [47] at 121:22–122:5.)  Defendants state that "[a]t no point in time did Plaintiff inform anyone at District 205 that he was admitted to or discharged from UW Health SwedishAmerican Hospital from December 7, 2021 to December 10, 2021."  (DSOF [44] ¶ 66.)  But Parker disputes this.  He points out that on

8

December 9, 2021, he signed Family Medical Leave Act ("FMLA") paperwork from his hospital bed, and staff at the Glenwood Center, where Nurse Practitioner Forman worked, faxed documents to the ReedGroup, District 205's third-party administrator for employee FMLA applications, that same day.  (DSOF ¶¶ 78, 67.)  Parker argues that because the ReedGroup received the FMLA paperwork from Parker's mental health providers during his hospitalization, Defendants had "knowledge of his mental health crisis."  (Pl.'s Resp. [67] ¶ 66.)  Parker asserts, further, that he had emailed the District 205 Human Resources Department about a month earlier, on November 8, 2021, asking "How does an employee 'apply' for medical leave?"  (DSOF [44] ¶ 72.)  The Human Resources Department responded, outlining the process; but Parker's communication did not say whether he was asking on his own behalf, on behalf of one of the District 205 coaches, or on behalf of an employee who reported to him.  (*Id.* ¶ 73.)

On December 14, 2021, at a "regular public meeting, the District 205 Board of Education unanimously approved a resolution" terminating Parker "based on the charges of misconduct contained in the relevant Bill of Particulars."[3]  (*Id.* ¶ 47.)  The same day, Plaintiff's attorney reached out to Hoadley, informing her that he represented Parker, but Hoadley did not respond.  (PSOF [67] ¶¶ 15, 16.)  Plaintiff's counsel also spoke with Yashekia Goldsmith and Jim Pirages, two other attorneys for District 205 on December 14.  Pirages offered Parker "the opportunity to resign in

---

[3]      In his Local Rule 56.1 Statement of Additional Facts, Parker claims that Jude Makulec, the President of the Board of Education of District 205 at the relevant time of this litigation, "admitted" in her deposition that "she and other board members received communications from various people before the BOE voted to terminate Plaintiff's employment asking the BOE to delay their vote because plaintiff was suffering from mental illness and was unable to attend the 12/14/21 board meeting due to his illness."  (PSOF [67] ¶ 14.)  To support this claim, Parker cites to Makulec's deposition testimony at pages 49–53 "as well as the exhibits to her deposition."  (*Id.*)  The exhibits to Makulec's deposition are not in the record, and Makulec's testimony does not describe the contents of the Exhibits the parties and the witness reference in any detail.  Local Rule 56.1(b)(3) requires a party opposing summary judgment to attach "cited evidentiary material not attached to the LR 56.1(a)(2) statement or LR 56.1(b)(2) response."  Because Parker failed to attach the Exhibits to Makulec's deposition testimony, the court deems any argument that would be supported by those exhibits forfeited.  The court has now reviewed the materials, however, and concludes that if they were properly submitted, they would not require a different ruling on any of the issues before the court.

lieu of action by the Board of Education at the December 14, 2021, regularly scheduled Board of Education meeting." (Defs.' Resp. [71] ¶¶ 17, 18.) It is unclear whether these conversations happened before or after the Board voted to terminate Parker.

## II. Procedural History

This lawsuit resulted. Parker first filed an Equal Employment Opportunity Commission charge on August 16, 2022. (Compl. [1] ¶ 23.) Plaintiff's Complaint [1] brings three claims against District 205, Jarrett, and Zediker. First, he claims that Defendants violated Titles II and III of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Rehab Act") in failing to accommodate his mental impairments and declining to delay the BOE's vote on his termination his employment until his condition was stabilized (Count I). Next, he claims that Defendants violated the FMLA by summarily denying his application for an FMLA leave of absence and terminating his employment (Count II). And finally, he brings a claim under 42 U.S.C. § 1983 alleging that Defendants violated his constitutional right to due process by "denying [his] request to delay his pre-termination hearing and voting to terminate his employment" (Count III). Defendants moved for summary judgment [53], arguing that Title II and III of the ADA do not apply to claims of employment discrimination, that Parker never provided Defendants with notice of his FMLA Request or any symptoms of his medical condition, and finally that they afforded Parker all the rights to due process of law that he was entitled to. Parker opposed [68] and Defendants replied [72]. The motion is now fully briefed and ready for the court's consideration.

## LEGAL STANDARD

Summary judgment is appropriate if "'there is no genuine dispute as to any material fact,' and the moving party 'is entitled to judgment as a matter of law.'" *Johnson v. Edwards*, 164 F.4th 1074, 1079 (7th Cir. 2026) (quoting FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In considering a motion for summary judgment,

10

the court construes "the facts in the light most favorable" to the non-moving party and draws "all reasonable inferences in its favor." *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025). It does not "weigh evidence or make credibility determinations." *Johnson*, 164 F.4th at 1079.

Once a motion for summary judgment has been properly supported, the opposing party must produce affirmative evidence showing there is more than a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). An opposing party must produce affirmative evidence raising a genuine issue for trial; they may not rest upon allegations in the pleadings. *Anderson*, 477 U.S. at 256–57 (1986). Speculation "cannot create a genuine issue of fact that defeats summary judgment" and "is insufficient to defeat a summary judgment motion." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) (citing *Circle City Broad. I, LLC v. AT&T Servs., Inc.*, 99 F.4th 378, 384 (7th Cir. 2024)).

## DISCUSSION

### I. ADA and Rehab Act Claims

Parker brings Count I under Title II and III of the ADA, as well as the Rehab Act, alleging that Defendants terminated him on the basis of his disability and failed to accommodate his mental impairment by failing to delay the BOE vote on his termination until he was medically able to attend. Defendants challenge Parker's ADA claim on the basis that Titles II and III do not apply to employment discrimination; they are correct on this point. The Seventh Circuit has held that "Title II of the ADA does not cover disability-based employment discrimination. Instead, employment-discrimination claims must proceed under Title I of the ADA, which addresses itself specifically to employment discrimination and, among other things, requires the plaintiff to satisfy certain administrative preconditions to filing suit." *Brumfield v. City of Chicago*, 735 F.3d 619, 630

11

(7th Cir. 2013).[4] But while Parker indeed failed to plead Title I of the ADA as a basis for relief in his complaint, "in our system of notice pleading, complaints need only plead facts sufficient to put defendants on notice of the claims against them . . . 'there is no rule requiring parties to plead legal theories or elements of a case.'" *R3 Composites Corp. v. G&S Sales Corp.*, 960 F.3d 935, 942 (7th Cir. 2020) (quoting *Auto Driveaway Franchise Systems, LLC v. Auto Driveaway Richmond, LLC*, 928 F.3d 670, 675 (7th Cir. 2019)). Because both parties have addressed the merits of such a claim (*see* Opp'n [68] at 6–8; Reply [72] at 10–12), the court will address it.

Parker appears to advance two theories of disability discrimination. First, he contends that Defendants failed to accommodate his disability by delaying the BOE's vote on his termination until he was mentally well enough to attend. "In order to establish a claim for failure to accommodate, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 682 (7th Cir. 2014). The Seventh Circuit in *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) affirmed the district court's grant of summary judgment for a defendant employer because plaintiff's requested accommodation (a three month leave of absence after his FMLA leave expired) did not fall within the ambit of the ADA. The court noted that "the ADA is an antidiscrimination statute, not a medical-leave entitlement," and held that "reasonable accommodation" is "one that allows the disabled employee to perform the essential functions of the employment position." *Id.* at 479, 481 (citation and internal quotation marks omitted). An employee is not a "qualified individual" under the terms of Title I of the ADA where "the proposed accommodation does not make it possible for the employee to perform his job." *Id.* at 481. Parker's requested accommodation of a delay in the BOE's vote is not one that would facilitate his ability to work, as demonstrated by its

---

[4] The "administrative preconditions" do not appear to be an impediment to a Title I claim here, as it appears Plaintiff Parker did file an EEOC charge and received a Right to Sue letter. (*See* Compl. Exh. 2 [1-2].)

12

incongruence with the examples listed as reasonable accommodations in the language of the statute. 42 U.S.C. § 12111 (outlining examples of "reasonable accommodations" including "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."). Parker's contention that Defendants discriminated against him because they failed to accommodate his request for a delay on his termination vote fails as a matter of law.

As for Parker's contention that the district fired him on the basis of his disability, this argument similarly does not hold up. Both the ADA and the Rehab Act "protect[] qualified employees from discrimination 'solely by reason of' disability, meaning that if an employer fires an employee for any reason other than that she is disabled—'even if the reason is the consequence of the disability'—there has been no violation of" either statute. *Brumfield*, 735 F.3d at 631 (quoting *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195–96 (7th Cir. 1997)). Parker acknowledges that the bases for his termination were his "insubordination," his failure to "attend[] meetings" and his "unprofessional comments/emails," but he claims that this conduct "was a manifestation of plaintiff's disabilities." (Opp'n [68] at 7.) But this argument—that unsatisfactory conduct cannot be grounds for discharge if such conduct is a product of disability—is foreclosed by binding precedent. In *Brumfield v. City of Chicago*, 735 F.3d 619 (7th Cir. 2013), the plaintiff similarly argued that the conduct her employer cited as the basis for her termination was "merely a manifestation of her psychological problems and that she was therefore discharged because of her disability." *Id.* at 630. The Seventh Circuit affirmed the district court's dismissal, holding that "[a]n employer may fire an employee for engaging in unacceptable workplace behavior without violating the ADA (or the Rehabilitation Act), even if the behavior was precipitated by a mental illness." *Id; see also Palmer v. Cir. Ct. of Cook Cnty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997) ("But if an employer fires an employee because of the employee's

unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the Americans with Disabilities Act."). Parker's discriminatory termination argument fails as a matter of law.

Summary judgment for Defendants is granted on Count I.

## II. FMLA Claim

Next, Parker argues that Defendants interfered with his FMLA rights by "fail[ing] to process his FMLA paperwork," by "fail[ing] to adjust their demands that [Parker] appear for meetings," and by "refus[ing] to delay their vote to terminate [Parker's] employment even though they knew he was in a serious mental health crisis." (Opp'n [68] at 6.) "[T]o establish a prima facie case of interference, [Parker must] demonstrate (1) he was eligible for the FMLA, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Lutes v. United Trailers, Inc.*, 950 F.3d 359, 365 (7th Cir. 2020) (citing 29 U.S.C. § 2615). Defendants effectively concede that Parker was eligible for FMLA leave, that the District was covered by the FMLA, and that Parker was entitled to leave, but they challenge Parker's claim on the fourth prong of this analysis: they argue that, as a matter of law, Parker failed to give them sufficient notice of his intent to take leave, and the decision to terminate him was based on conduct that occurred prior to his request for leave. But the record before the court shows there are disputes of material fact on this issue.

The Seventh Circuit has recognized "constructive notice of the need for FMLA leave" where employees exhibit "stark behavioral changes, such as an employee who suddenly and uncharacteristically began aggressively shouting at coworkers over minor occurrences." *Guzman v. Brown Cnty.*, 884 F.3d 633, 639 (7th Cir. 2018) (citing *Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 726–727 (7th Cir. 2007), where the court reversed the district court's grant of summary judgment for defendant employer because "[t]aking the facts in the light most favorable to Stevenson, we conclude that a trier of fact could find that her behavior was so bizarre that it

14

amounted to constructive notice of the need for leave"). In this case a reasonable jury could find that Defendants had constructive notice of Parker's need for leave based on Parker's relatively sudden and troubling shift in behavior. Jarrett testified that a little over a month before Parker was terminated, he noticed Parker's engaging in conduct that was "not [] typical behavior for Mat Parker," a man he had worked with for ten years. (Jarrett Dep. [46] at 42:4–6; 32:23–24.) This is coupled with Parker's odd request to take on a second, out-of-state full-time job; the bizarre emails Parker sent to Jarrett and District 205 partners after midnight on November 30; and the fact that prior to November of 2021, Parker had never refused to attend meetings with Jarrett. Thus, regardless of when Parker sent actual notice to Defendants that he was requesting leave under the FMLA, summary judgment on Count II is inappropriate.

### III.     Due Process Claims

Finally, Parker brings a claim under 42 U.S.C. § 1983 alleging that Defendants violated his right to due process by failing to afford him a pre-termination hearing before the BOE. "[D]ue process demands an employer provide certain pre-deprivation procedures to an employee, including at a minimum, notice of any charges, an explanation of the employer's evidence, and an opportunity for the employee to tell her side of the story." *Smoler v. Bd. of Educ. for W. Northfield Sch. Dist. #31*, 524 F. Supp. 3d 794, 805–06 (N.D. Ill. 2021) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985))

Parker's argument requires only brief discussion. It is undisputed that the BOE afforded Parker a pre-termination *Loudermill* hearing on December 6, 2021, but Parker failed to attend. (DSOF [44] ¶ 44; Pl.'s Resp. to DSOF [67] ¶ 44.) The Seventh Circuit has repeatedly held that "terminated employees who do not avail themselves of pre-termination hearings waive their right to contest the adequacy of such hearings." *Baird v. Bd. of Educ. for Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 694–95 (7th Cir. 2004); *Ryan v. Ill. Dep't of Child. & Fam. Servs.*, 185 F.3d 751, 761 (7th Cir. 1999) ("Ordinarily, when an employer offers a pretermination hearing and the employee fails to accept, the *Loudermill* right to such a hearing is waived."). And while the

15

court is sympathetic to the fact that Parker was experiencing what appears to have been a serious mental health emergency, an employer need only provide the employee with an *opportunity* to respond, and need not consider factors that might make an employee unable to attend the hearing in order to fulfill the employer's due process obligations. *See Raines v. Indianapolis Pub. Schs.*, 52 F. App'x 828, 832 (7th Cir. 2002) (finding that a defendant employer's due process obligations were fulfilled where the employer scheduled a pretermination hearing while plaintiff employee was incarcerated, because "though [plaintiff] could not be physically present at the hearing, he did have a chance to tell [his] side of the story . . . [because he] could have presented his case in writing or designated a representative to attend the hearing on his behalf, but he did neither.")

Summary judgment for Defendants is granted on Parker's Due Process claim.

### **CONCLUSION**

Defendants' motion for summary judgment [53] is granted in part and denied in part.

ENTER:

Dated: March 30, 2026

REBECCA R. PALLMEYER
United States District Judge

16